IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| | * | |
| JEREMIAH STADTLANDER, | * | |
| Intervenor-Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 09-0237-CG-N |
| | * | |
| WARREN VILLAGE (MOBILE) | * | |
| LIMITED PARTNERSHIP, | * | |
| WARREN PROPERTIES, INC., | * | |
| FRANK R. WARREN, LAURIE | * | |
| WEAVER AND EVELYN GRAVES, | * | |
| Defendants. | * | |

## UNITED STATES' MOTION TO COMPEL
## PRODUCTION OF ESI, AND ORDER FORENSIC IMAGE

Pursuant to Fed. R. Civ. P. 26, 34, and 37, Plaintiff, United States of

America ("United States"), by and through the United States Attorney,  Kenyen R.

Brown, hereby moves this Honorable Court for an Order compelling Defendants,

Warren Properties, Inc. ("Warren Properties"), and Warren Village (Mobile)

Limited Partnership ("Warren Village Partnership"), (1) to fulfill its Rule

26(a)(1)(A)(ii) requirements to produce or describe by category and location,

electronically stored information ("ESI"), in its possession, custody or control, to

support its defense in this case; (2)  to produce electronic files (vacancy status

reports)  as requested in discovery; (3) to allow the United States, through its

forensic computer analyst, to mirror image defendants' computer hard drives which contain any and all software operating systems that manage and/or process user input data relating to Warren Village Apartment ("Warren Village") unit status and/or availability from January 1, 2007 through December 31, 2008; and furthermore, (4) to allow the United States, through their computer expert, to conduct a forensic analysis of those imaged data base systems, to determine the authenticity and accuracy of the residential vacancy status reports Warren Properties produced during the Department of Housing and Urban Development ("HUD") investigation and subsequently during this litigation.

Pursuant to the Court's Rule 16(b) Scheduling Order (Doc. 25), the United States provides Ex. 1A (the relevant Interrogatories and U.S. Requests for Production to Warren Properties; Warren Properties' Responses and Supplemental Responses thereto; Warren Properties and Warren Village Partnership's Response to U.S. Request for a Forensic Image), and Ex. 1B (U.S. Request for a Forensic Image of Warren Properties and/or Warren Village Partnership's Hard Drives).

Pursuant to Fed. R. Civ. P. 37(a)(1), Assistant United States Attorneys Gary A. Moore ("Moore") and Deidre L. Colson ("Colson") certify to the Court that they have attempted in good faith to resolve the discovery dispute described above, and that in support thereof, the United States shows unto this Honorable Court the following:

# I.  BACKGROUND

The United States brought this action to enforce the Fair Housing Act, 42 U.S.C. § 3601, *et. seq*.  The Intervenor-Plaintiff, Jeremiah Stadtlander ("Stadtlander"), is a person with disabilities as defined by 42 U.S.C. § 3602(h). Although Stadtlander is paralyzed from the waist down, at the time he rented an apartment at Warren Village, located at 6427 Airport Boulevard, Mobile, Alabama, he was able to walk short distances by using leg braces and arm crutches.  On August 18, 2007, Stadtlander and Beaumont Carroll ("Carroll"), accepted Unit # 195, which is a second floor unit accessible only by exterior stairs, based upon their immediate need for lodging and conditioned upon Warren Village's express representations that a unit with a ground floor entrance would soon be available for transfer.

Stadtlander fell and suffered injury on two occasions while using the exterior stairs leading to apartment 195, first in late August 2007 and then again on or about November 26, 2007.  Both of these falls occurred after Stadtlander, and/or his care givers, requested disability accommodations to reside in an apartment with a ground level entrance near the front of the apartment complex.[1] Stadtlander, through Carroll and his mother, Ruha'mah Stadtlander, continued to

---

[1]Stadtlander, employed as a greeter with Wal-Mart, requested a unit near the front of the complex so that he could walk the short distance to the city bus stop located on Airport Boulevard.

request such a transfer, and specifically named unit # 5 as it was visibly unoccupied.  Ex. 2, Apartment Complex Layout.

Warren Village's resident manager, Laurie Weaver ("Weaver") repeatedly declined Stadtlander and Carroll's requests, explaining that ground level entrance units were not available.  Finally, after receiving no assistance from Weaver, Carroll contacted Weaver's area supervisor, Evelyn Graves ("Graves"), and requested an accommodation for the handicapped.  Ex. 3, 12/13/07 fax to Graves. In response thereto and at the direction of Graves, Weaver offered ground level entry unit #111, #68, and #98.  Ex. 4, Graves' 12/17/07 and 12/26/07 letters to Carroll and Stadtlander.  Stadtlander and Carroll declined these units, citing loca- tion far from the front of the complex, and further, Stadtlander's inability to access the units due to the slope of the parking lot.[2]  See Ex. 2.  Graves did not take any further action on the accommodation request after these units were declined.

Carroll, on behalf of Stadtlander, filed a complaint with HUD on February 22, 2008.  HUD conducted an investigation and issued a Determination on March 3, 2009, finding reasonable cause to believe that Warren Properties engaged in discriminatory housing practices based on disability in violation of § 804(f)(2) and § 804(f)(3)(b) of the Fair Housing Act.  Ex. 5, HUD 03/03/09 Determination at

---

[2] Stadtlander was hospitalized as a result of the second fall and subsequently confined to a wheelchair.

000283.  In support of HUD's charge of disability discrimination, HUD cited

evidence of at least four ground floor units, including unit #5, that were available

and that were not offered to Stadtlander to accommodate his disability.  *Id.* at

000278-000279, 000282.  Efforts at conciliation were not successful and this

litigation ensued on April 29, 2009.

**A.      Defendants claim complete defense based on computer software.**

The initial meeting of the parties was held on July 31, 2009, with the

following individuals in attendance:  AUSAs Moore and Colson on behalf of the

United States; Daniel Hannan, Esq. ("Hannan"), on behalf of Intervenor-Plaintiff

Stadtlander; and David Strassburg, Esq. ("Strassburg"), on behalf of Defendants

Warren Properties, Graves and Weaver.  During this meeting, Strassburg informed

the United States that the Residential Vacancy Status Reports produced to HUD

during its initial investigation were inaccurate; and furthermore, that the correct

Residential Vacancy Status Reports would ultimately demonstrate no liability on

the part of his clients.  Strassburg explained that Warren Properties' computer

software program generating these vacancy reports overwrote the original data on

each subsequent date of application.  Thus, according to counsel for defendants,

the computer generated vacancy reports that were printed daily contained the

accurate unit status information as compared to those the computer generated

reports printed on April 4, 2008, and provided to HUD on April 18, 2008.

**B.     United States immediate request for preservation and production of exculpatory Electronically Stored Information.**

During the parties' planning meeting, the United States informed defense counsel that these alleged discrepancies in the electronic or digital data on such a critical issue as apartment availability would necessitate the production of ESI and the need for a mirror image of the appropriate computer hard drive(s) to preserve the integrity of the data.  Ex. 6, Moore 08/07/09 e-mail to Strassburg (ESI is important in this case and the computer programs, including archival data, used by defendants to track apartment availability must be preserved).  Moreover, AUSA Moore strongly encouraged defense counsel to promptly produce this ESI to the United States for review and possible discussions with HUD about the appropriateness of dismissal.  The parties also addressed the importance of litigation hold notices, including the parties' obligation to preserve data and an agreement to certify compliance.  *See* Ex. 7, 08/06/09 Moore e-mail to Strassburg, Hannan with attached HUD litigation hold notices (please forward your litigation hold notices).

**C.     Defendants change lawyers.**

For reasons unknown to the United States, Strassburg withdrew his representation of Warren Properties, Weaver and Graves.  Warren Properties and Graves retained the Thomas Gaillard, III, ("Gaillard"), of Galloway, Wettermark,

Everest, Rutens & Gaillard, and Defendant Weaver retained the James Rossler

("Rossler").  On September 2, 2009, a second meeting of the parties was held to

include Attorneys Gaillard and Rossler.  Hannan continued to represent

Stadtlander.  In that meeting, the United States again expressed the need for ESI,

the importance of defendants preserving the computer data surrounding the

claimed erroneous vacancy reports; and the United States' request for a mirror

image to accomplish such preservation and production.  Ex. 8, 09/10/09 Gaillard

e-mail to Colson (referencing the United States' request for electronic discovery

during the parties' meeting, defense counsel conditioned its agreement to ESI

production pending specifics of the proposal); Ex. 9, 09/10/09 Colson e-mail to

Gaillard (the United States seeks mirror images and subsequent forensic analysis

of hard drives used by Warren Village/Warren Properties because of your

assertions that the computer software program is responsible for the vacancy

report discrepancies); Ex. 10, 9/11/09 Moore e-mail to Gaillard/ Rossler with

attached ESI Initial Disclosure Request (United States defines ESI request

applicable to defendant's Initial Disclosures, which includes the alleged

exculpatory electronic information on apartment availability whether stored in

system files, deleted files and hidden data). Litigation hold notices were again

discussed, and Gaillard agreed to follow up with prior counsel, and to provide

compliance notification.[3]

**D.    ESI, Mirror Image and Litigation Hold Notice request continues with Report of the Parties Planning Meeting.**

In the proposed Report of the Parties' Planning Meeting, the United States included an ESI section in the proposed discovery plan, which detailed the discrepancies in the defendants' vacancy reports, the request for a mirror image, and the need for all parties' compliance with litigation hold notice certification. Ex. 11, 09/11/09 U.S. Proposed Report of Parties' Planning Meeting at ¶ 4.c. (The parties discussed the United States' request to mirror image Warren Properties' computers because of Defendants recent disclosure that inaccurate copies of electronic documents were produced to HUD.  The parties have agreed to provide redacted copies of their litigation hold notices.).  The United States included a "clawback" and "quick peek" provision as part of this component of discovery.  *Id.*

Counsel for the defendants vigorously objected by e-mail, as well as by teleconference (09/11/09 Colson, Hannan, Rossler and Gaillard), citing such an ESI request as premature.[4]  Ex. 12, 09/11/09 Gaillard e-mail to Moore /Colson (defendants object to the United States' proposed ESI section 4.c., and argue that

---

[3]The United States provided copies of redacted litigation hold notices to defendants on August 6, 2009 (Ex. 7).

[4]However, Fed.R.Civ.P. 26(f) directs the parties to discuss discovery of ESI during the discovery planning conferences. *See In Re Seroquel Products Liability Litigation*, 244 F.R.D. 650, 655 (M.D. Fla. 2007).

additional time is needed to address the ESI issues); Ex. 13, 09/14/09 Moore e-mail to Gaillard)(United States seeks defendants' specific concerns with ESI). After several proposed revisions, e-mails and conference calls, and in an effort to provide the Court with a joint planning report, the United States amended its proposed discovery plan. *See* Report of the Parties Planning Meeting, Doc. 24 at 7-8 (parties are in disagreement on the form and extent of ESI).

**E.    Formal and informal ESI discovery efforts by the United States.**

Throughout the discovery period, the United States has continued to seek cooperation from the defendants to produce the requested ESI and/or to allow the United States to mirror image the relevant hard drives.  Ex. 14, 02/19/10 Colson ltr to Gaillard; Ex. 15, 04/08/10 Colson ltr to Gaillard at 2 fn 2; Ex. 16, 06/01/10 Colson ltr to Gaillard; Ex. 17, 06/16/10 Moore ltr to Gaillard.  Moreover, in an effort to alleviate Warren Properties' concerns that a mirror image of selected hard drives would provide "unfettered" access to privileged, confidential, and irrelevant information, *see* Ex. 18, 04/09/10 Gaillard ltr at ¶ 3 (due to the breadth of your request to mirror image computer files, we need to develop a protocol for the electronic discovery), the United States proposed, as other federal courts have ordered, the implementation of protective orders, confidentiality agreements, and ESI protocols.

By letter dated April 9, 2010, Warren Properties submitted the affidavit of

Douglas A. Greene ("Greene"), certified computer examiner, to the United States

in an effort to explain the discrepancies in the computer generated reports. Ex. 18.

Greene, without providing the basis for his methodology, and without identifying

what information systems he reviewed or imaged, if any, concluded that the

software used by Warren Properties was responsible for the inaccurate reports to

HUD. Ex. 19, Greene Affidavit at ¶ 8 (discrepancies in vacancy reports produced

documents exist because of the design of the Realwise© software used to generate

these reports).

The United States consulted with computer forensic specialist, Gus

Dimitrelos, ("Dimitrelos"), who explained that the only way to evaluate Greene's

conclusions, Defendants' explanations, and the difference in data contained in the

produced vacancy reports in .pdf format, would be to conduct a forensic analysis

of the mirror imaged hard drives and back up systems that contain the Realwise©

software data. Ex. 20, Dimitrelos Decl. at ¶ 9.

**F.     The United States and Defendants discuss imaging process and
        protective protocol.**

At the urging of defense counsel, the United States, with the assistance of

Dimitrelos and relying on other federal districts courts' ESI protocol guidelines[5],

---

[5] The United States is guided by the "Suggested Protocol for Discovery of Electronically
Stored Information ("ESI"), authored by the Honorable Paul W. Grimm, Magistrate Judge, U.S.
District Court, Maryland.

proposed an ESI protocol for the mirror imaging process. Ex. 21, 04/28/10 Colson

ltr to Gaillard; Ex. 22, U.S. Proposed ESI Protocol. The proposed protocol

included the execution of non-disclosure agreements; the defendants' designation

of their own information technology ("IT") specialist; and defendants

identification of relevant software, database programs, storage systems, back up

systems, and/or archival systems used at Warren Village to document apartment

unit status and history from January 1, 2007 to present. Ex. 22 at 3. Dimitrelos,

alongside defendants' IT specialist, would image and securely maintain the copied

hard drives. *Id.* Defendants would identify attorney-client/work-product search

terms for initial filtering from the imaged data base; and thereafter, agreed upon

search terms would be used to further streamline the ESI production (*i.e.*,

apartment rental status, vacancy, and repair/cleaning). *Id.* at 3-4. This filtered data

would then be provided to defendants for further review prior to production to the

United States. *Id.* at 4-5.

On May 12, 2010, Gaillard, Greene, Colson and Dimitrelos participated in a

telephone conference to discuss the proposed ESI protocol. Defendants offered

the inclusion of clawback agreements, to which the United States readily agreed

and had attempted to include in the Parties Planning Report filed with the Court in

September 2009. Defense counsel argued against the sufficiency of the proposed

protections afforded to privacy and privilege information, and further, argued that

the information sought, *i.e.*, the location and type of servers, backup systems and software programs used at Warren Village, needed to be formally requested through discovery.   Defendants objected to the identified search terms/ subject matter areas contained in the proposed protocol.

In response to counsel's objections, the United States explained that the mirror image was a means to **preserve** the data (Phase One), and that the filtering process was a component of document **production** of relevant ESI (Phase Three). Thus, issues with production, *i.e.*, privacy, privileged, and agreed upon search terms, could be worked out after the mirror image process was completed.   This type of tiered discovery is particularly helpful with ESI production as the location, identity and retrieval of electronically stored information can be more complicated and voluminous than the previous days of producing paper documents.   Defense counsel, however, continued its general objection that the United States wanted "everything" with the mirror image.

Finally, AUSA Colson essentially asked defense counsel the following question: "Assuming the confidentiality, privilege and relevance concerns could be resolved, did the defendants object to Dimitrelos imaging the applicable Warren Village hard drives as a means to preserve the data in question?"   Defense counsel voiced and affirmed his objection to ANY mirror image of selected Warren Properties' hard drives, even with a protective protocol in place.

According to defendants, Greene's affidavit adequately addressed the issue. Thus, the teleconference concluded with the parties in agreement that United States should proceed with a Motion to Compel.

Prior to filing the present motion to compel, the United States, out of an abundance of caution, formally served a request to inspect and copy the defendants' hard drives on May 24, 2010. Ex. 1B, United States Request for a Forensic Image of Warren Properties and/or Warren Village Partnership's Hard Drive (discrepancies in computer generated document production, failure to produce ESI and failure to provide certification of litigation hold notices necessitates mirror imaging of remote and on-site hard drives that service Warren Village Apartments). By letter dated June 1, 2010, the United States clarified this formal request to mirror image hard drives as the same issue surrounding the vacancy reports that has been discussed since the inception of this litigation. Ex. 16 (U. S. formal Rule 34 request to mirror image clients' computer hard drives pertains to the apartment vacancy reports). Although defendants argue that they have issued litigation hold notices, *see* Ex. 23, 05/25/10 Gaillard ltr to Colson, the defendants have not provided the United States with copies of redacted litigation hold notices as agreed upon and as requested. Ex. 16 at 2, ¶ 1-2 ("To date, the United States has not received specific verbal or written confirmation from you or Warren Properties' previous counsel, that litigation hold notices have been issued

to Warren Properties, their agents, employees or representatives, to include the dates the notices were issued, to whom they were issued, and to which department and/or offices the notices applied. . . . please provide copies of any and all litigation hold notices. . . ."); Ex. 15, 04/08/10 Colson ltr to Gaillard (defendants have not complied with ESI requests, including the verification of litigation hold notices), *see also* Ex. 24, 06/03/10 e-mail to defense counsel, A. Jacobs (please provide confirmation of litigation hold notices).

On June 17, 2010, defendants noticed their formal objection to the United States' request to conduct a forensic analysis of their computer hard drives. Ex. 1A (defendants argue imaging computer hard drives is unduly, burdensome, overly broad, intrusive, and will not produce relevant information). The parties participated in a teleconference on July 1, 2010 (Colson, Moore, and Gaillard), once again in an attempt to resolve any issues prior to seeking court intervention. Although the United States is agreeable to limiting the search criteria to the apartment vacancy reports from January 1, 2007 to December 31, 2008, the method of achieving both preservation and production of ESI remains in dispute.

## II. ARGUMENT

The United States seeks an Order from the Court compelling Warren Properties and Warren Village Partnership (1) to compel defendants to fulfill their ESI discovery obligations on issues relevant to their defense pursuant to Fed. R.

14

Civ. P. 26(a); (2) to produce ESI in response to discovery requests (electronic

vacancy reports); (3) to provide the United States access for inspection, copying

and/or testing of all hard drives which contain any and all software operating

systems that manage and/or process user input data relating to apartment unit

status and/or availability from January 1, 2007 through December 31, 2008 at

Warren Village; and (4) to allow the United States' computer expert to conduct a

forensic analysis of the mirror imaged hard drives to determine the design,

intricacies and functional capabilities of the Realwise© software program, or any

other software program, used at Warren Village to track, record, or otherwise

report apartment rental availability.

**A.    Producing select electronic files in scanned .pdf format is not responsive to the United States' discovery requests.**

Rule 26 and Rule 34 of the Federal Rules of Civil Procedure were amended

in 2006 to provide for routine discovery of electronic information from parties and

non-parties. *See Auto Club Family Ins. Co. v. Ahner*, No. CIV. A. 05-5723, 2007

WL 2480322, at *3 (E.D. La. Aug. 29, 2007)( Rule 34(a)(1)(A), as amended, now

designates that a party may serve on another party a request for discovery of

electronically stored information). Rule 34 places ESI on equal footing with the

discovery of paper documents, and thus requires a reasonable basis or explanation

for the failure to produce responsive documents to discovery requests. *See Bank*

*of Mongolia v. M&P Global Financial Services, Inc.*, 258 F.R.D. 514, 519 (S.D.

Fla. 2009)(M&P counsel were unable to identify what steps taken to identify responsive documents and had not searched deleted computer records). Moreover, the producing party has an affirmative obligation to search available electronic systems for deleted files. *See Wells v. Xpedx*, No. 8:05-CV-2193TEAJ, 2007 WL 1200955, *1-2 (M.D. Fla. Apr. 23, 2007), citing *Advisory Committee Notes*, Fed. R. Civ. P. 34.

In the instant case, the United States specifically requested any and all **electronic files**, including modified, lost or deleted files, pertaining to unit vacancies from January 1, 2005 to present. See Ex. 1A (emphasis added). In response thereto, Warren Properties referenced the scanned .pdf paper copies of the electronic vacancy reports previously produced with its Initial Disclosures. *Id.* The United States articulated the insufficiency of this response by letter dated 02/19/10, citing Warren Properties' failure to produce ESI information and failure to comply with the requested five year time frame. Ex. 14, Colson letter to Gaillard at 4. On March 11, 2010, counsel for the United States and Warren Properties participated in 1-1/2 hour conference call on these discovery issues, to which defense counsel objected to any time frame beyond the Stadtlander and Carroll tenancy at Warren Village (6 months).[6] During the teleconference, defense

---

[6]In addition to the vacancy reports produced to HUD and produced with Initial Disclosures, Warren Properties supplemented its discovery responses on April 9, 2010; April 29, 2010; and June 14, 2010, to produce vacancy reports dated 05/15/07, 06/20/06, 07/25/06, 08/29/06, 09/25/06, and 11/06/07.

counsel was unclear as to why the scanned paper copies of computer generated vacancy reports did not constitute production of electronic files as requested. On April 8, 2010, the United States again expressed its concern over defendants' failure to produce the requested ESI as required by Rules 26 and 34 of the Federal Rules of Civil Procedure; and further, questioned whether it remained appropriate for the United States to delay court intervention on these critical ESI issues, given defendants continued failure to adequately respond to outstanding discovery requests. Ex. 15.

In response to the United States assertion that defendants are required to produce requested ESI pursuant to the Federal Rules of Civil Procedure, defendants argued that the .pdf documents, which appeared to be scanned paper copies, on the disk provided with its Initial Disclosures constitute ESI production. See Ex. 18, 04/09/07 Gaillard ltr to Colson at ¶ 2. To further explain why the electronic files printed to paper were the accurate documents, defendants supplemented their discovery responses to include the affidavit of computer analyst Doug Greene. Nonetheless, printed documents from a computer do not constitute production of an electronic file. "Today it is black letter law that the computerized data is discoverable if relevant." *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 1995 U.S. DIST LEXIS 16355, *4 (S.D.N.Y Nov. 3, 1995).

As a result of Warren Properties' failure to comply with Rule 26(a)

discovery obligations and failure to produce the requested ESI in discovery, the

United States propounded supplemental discovery on April 5, 2010, seeking

further explanation from defendants as to their employees' procedure in printing

and storing the physical copies of the vacancy reports, how the documents were

created, stored and retrieved electronically, the identity of any individuals

involved with the document production; the identity and location of all storage

sites for paper and electronic files, and also, specific details surrounding the HUD

production and the Initial Disclosure productions.  Ex. 1A, Interrogatories 15-19.

Defendants identified Kat Ballas as the individual who printed the April 3, 2008

vacancy reports from the database; and identified Weaver as the individual who

printed and filed the vacancy reports daily.  *Id.*; see also Ex. 25, Weaver Response

to U.S. Interrogatory Number 13 (Vacancy reports are created daily by in-putting

the relevant information into the computer.  "I print those reports on a daily basis

so that I will have an accurate and dependable copy of the vacancy status

information.").

The above referenced discovery responses on their face exemplify

defendants lack of effort to identify, search, and/or produce the electronic files as

requested.  Electronic files are searchable, and include meta data reflecting the

creation date, last access dates, any and all edits, the identity of the user, and any

prior versions or editorial changes.  *See In re NYSE Securities Specialist Lit.*, 2006

WL 1704447 (S.D.N.Y. June 14, 2006)(ordering production of electronic docu-

ments as native files with associated metadata).  Indeed, given defendants' incon-

sistent and incomplete production of the electronically created and stored vacancy

reports, as well as defendants' explanation that these discrepancies resulted from

the application of their software program, the need for the meta data is even more

compelling on the issue of authentication.  *See, e.g., Koosharem Corp v. Spec.*

*Personnel, L.L.C.*, No. CIVA 608-583-HFF-WMC, 2008 WL 4458864 (D.S.C.

Sep. 29, 2008)(Court ordered mirror image of hard drive where production of

almost 2,000 e-mails did not contain an accurate copy of the original e-mail).

In sum, defendants have defaulted in their discovery obligations to produce

ESI which is germane to their alleged defense in this case; have failed to take

reasonable steps to retrieve the electronic data, including a search of its computer

files for deleted data; and have provided incomplete and inconsistent document

production of apartment vacancy reports in an unacceptable format.

**B.     The Court has authority pursuant to Fed. R. Civ. P. 34 and 26(b) to
order mirror imaging of Warren Properties and Warren Village
Limited's hard drives.**

Since the 2006 amendments to the federal rules, federal courts have

increasingly had to consider requests for inspection or requests for forensic or

mirror imaging of computer hard drives.  The Court has authority under Fed. R.

Civ. P. 34 and 26(b) to order mirror imaging of a party's hard drive. *See Balboa*

*Threadworks, Inc. v. Stucky*, No. 05-1157-JTM-DWB, 2006 WL 763668 (D. Kan.

Mar. 24, 2006); *Communications Center, Inc. v. Hewitt*, No. CIV. S-03-1968 WBS

KJ, 2005 WL 3277983 (E.D. Cal. Apr. 5, 2005); *Ameriwood Industries, Inc. v.*

*Liberman,* No. 4:06CV524-DJS, 2006 WL 3825291 (E.D. Mo. Dec. 27, 2006).

In making such a determination, Courts have considered whether or not the

computer hard drives contain documents responsive to a request for production.

In *Balboa Threadworks, Inc. v. Stucky*, No. 05-1157-JTM-DWB, 2006 WL

763668, at *4 (D. Kan. Mar. 24, 2006), the district court ordered imaging of defen-

dants' computer hard drive where e-mails contradicted defendants' representation

that no responsive materials existed.

Courts also consider whether the responding party has produced documents

which contain inconsistencies and discrepancies. *See Jacobson v. Starbucks*

*Coffee Co.,* No. 05-1338 JTM, 2006 WL 3146349, at *6-7 (D. Kan. Oct. 31, 2006)

(a history of incomplete and inconsistent responses to production requests was

enough to warrant production of computer hard drive for mirror imaging);

*Ameriwood Industries, Inc. v. Liberman,* No. 4:06CV524-DJS, 2006 WL 3825291,

at *1 (E.D. Mo. Dec. 27, 2006)(discrepancies or inconsistencies in discovery

responses may justify a party's request to allow an expert to create a mirror

image); *In Simon Prop Group L.P. v. mySimon Inc.*, 194 F.R.D. 639, 641 (S.D.

Ind. 2000)(plaintiff allowed to recover deleted files from defendants' hard drives

because plaintiff had shown discrepancies in the defendants' responses.); *Cf,*

*Calyon v. Mizuho Sec USA, Inc.*, 2007 WL 1468889, at *5-6 (S.D.N.Y. May 18,

2007)(court denied plaintiff's motion to compel mirror image of defendants' hard

drive for failure to show discrepancies or inconsistencies in defendants' discovery

responses).

**1.    Defendants produced incomplete and inconsistent documents**

In the present case, a critical issue for the United States **and** Warren

Properties is whether or not there were any apartment units available at Warren

Village that would have accommodated Jeremiah Stadtlander's disability, *i.e.*, a

ground level apartment located at the front of the complex.  The Warren Property

Residential Vacancy Status reports record the type and location of a rental unit, the

date the unit was vacated, the number of days the unit remained vacant, the unit

status (according to defendants' terminology, a "Down Unit," a "Make Ready

Unit," or a "Ready to Rent Unit"), and various comments dealing with repairs,

tenant names, and work status.

By letter dated April 18, 2008, Bruce Warren, on behalf of Warren Pro-

perties, provided the HUD investigator with physical copies of computer exported

vacancy reports for the time period of August 1, 2007 through January 31, 2008.[7]

These records showed units located at the front of the complex with a ground floor

---

[7]Carroll and Stadtlander rented Unit #195 from August 18, 2007 until February 18, 2008.

entrance as "ready to rent."  On or about October 6, 2009, Warren Properties

produced .pdf copies of 166 computer exported pages of Residential Vacancy

Status reports for Warren Village Apartments from 08/01/07 through 02/28/08.

These subsequently produced reports showed identified vacant units as "down

units" or "make ready" units, and thus, according to defendants, were not available

to fulfill Stadtlander's accommodation request.

By way of example, HUD reviewed a 09/15/07 vacancy report, Ex. 26,

Image 000499, showing that Unit #5, a ground level entry apartment located at the

front of the apartment complex, was vacated on 09/03/07 with a status of "Ready

to Rent."  HUD also reviewed a 11/30/07 vacancy report, Ex. 26, Image 000506,

showing Unit #5 vacant for 88 days and "Ready to Rent."  In comparison, how-

ever, the 09/15/07 vacancy report produced during this litigation, Ex. 26, Image

001337, WP0275, showed Unit #5 vacated on 09/03/07, but it was considered a

"Down Unit."  Furthermore, according to these newly provided records, Unit #5

was not deemed "Ready to Rent" until 11/28/07.  Ex. 26, Image 001396, WP0334.

Providing yet another inconsistent document, defendants, on June 14, 2010,

produced a Residential Vacancy Status Report dated 11/06/07.  This new docu-

ment contains handwritten notes that are not present on the claimed "accurate"

11/06/07 vacancy report provided with its Initial Disclosures on October 6, 2009.

Ex. 26, compare Image 001378, WP0316 to Image 021778, WP18615.

Defendants claim, after litigation commenced, that the vacancy status reports they produced during the HUD investigation in April 2008 are inaccurate. Defendants' computer forensic analyst, Greene, explained that the design of the Realwise© Software program used to generate the vacancy reports only includes the current status of the apartment in the rental status column, and that previous rental status values are not tracked in the current database. Ex. 19, Greene Affidavit at ¶ 8. Thus, Greene concludes that the 11/15/07 vacancy report dated 11/15/07 is the only report that accurately reflects the true status of the apartments as of 11/15/07. The 11/15/07 vacancy report printed on 04/03/08 only reflects the status of those apartments as of 04/03/08, not 11/15/07. Ex. 19, Greene Affidavit at ¶ 10. Greene opines that the rental status column shown on the report cannot be used to determine the status of an apartment at any time in the past, rather it can only be used to indicate the status of an apartment at the point in time it is viewed or printed. Ex. 19, Greene Affidavit at ¶ 9.

However, Greene's assertion is contradicted by the information touted by the developer of the Realwise© software. According to the Realwise© software homepage, the management of data and access to historical information has NO limitations and is easily retrievable. *See* Ex. 27 at 2, AVM Technology, http://www.avmtech.com/real.html )(last visited July 9, 2010)("A *complete* audit trail of your records is always available. There is no limit to the amount of

historical data you can retain.")(emphasis added).

As Dimitrelos explains in his declaration, Greene's conclusion is one of the precise reasons a mirror image is necessary to determine the correct rental status values of the apartment units during the time Stadtlander and Carroll resided at Warren Village.  Ex. 20, Dimitrelos Decl. at ¶ 8 (Paragraph 8 of Greene's affidavit illustrates the importance of examining an exact duplicate of the storage media and backups of the database.  Greene identified that the exported database only reveals current database data, and does not include previous data base data.)  Only an analysis of the entire digital storage media, such as the Warren Village Apartments' hard drives and any backed up databases, will reveal the accurate database apartment vacancy values.  *See* Ex 20, Dimitrelos Decl. at ¶ 9.  A mirror image, which replicates bit for bit, sector for sector, all allocated and unallocated space, including slack space, systems files, deleted files and hidden data, on the computer hard drive(s), will preserve critical discovery data such as: (a) report and/or database metadata to include dates created, modified, and accessed; (b) database records which may reside in database backups, digital storage media (hard drive and logical drive), and free-drive space of digital storage media; (c) evidence that the database was altered, deleted or recreated; and (d) evidence that records within the database were altered or deleted. Ex. 20, Dimitrelos Decl. at ¶ 7.  Finally, Dimitrelos opposes Greene's methodology of analyzing copied and exported data

which is contrary to established computer forensic practices, which adheres to a

"strict bit-for-bit duplicate imaging process and hashing verification, such as

MD5, SHA1 or SHA256." Ex. 20, Dimitrelos Decl. at ¶ 6.

Based on the forgoing, it is clear that imaging the Warren Village data

system is critical in determining the accurate rental status of the units that would

have been available to accommodate Stadtlander's disability.

### 2.     It is unclear whether defendants have preserved the relevant ESI.

A duty to preserve evidence is an "affirmative obligation," which arises

when the party in possession of the evidence knows that the litigation is probable;

and furthermore, the party in possession of the evidence can foresee the harm or

prejudice that would be caused to the party seeking the evidence if it was

discarded.  *See Hohider v. United Parcel Service, Inc.*, 257 F.R.D. 80, 82 (W.D.

Penn. 2009); *Zubulake v. UBS Warburg*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).

Preservation of the data ensures that potentially relevant or responsive electronic

information is protected against alteration or destruction.  Indeed, the district court

in *Ferron v. Search Cactus, L.L.C.*, No. 2:06-CV-327, 2008 WL 1902499, at *3-4

(S.D. Ohio Apr. 28, 2008), premised its order allowing the defendants to mirror

image plaintiff's hard drive on plaintiff's failure to provide a proper litigation hold

on relevant discovery materials.

Other than the recent general statement that litigation hold notices have

been issued, Warren Properties has failed to respond to the United States repeated requests for certification of written litigation hold notices issued to Warren Properties, Inc., Warren Village Apartments, and/or its employees, agents, and representatives. Moreover, it is unclear at this stage of litigation if the defendants' IT department has been involved with the ESI preservation and production; and further, if the defendants have discontinued or halted any type of automatic destruction, deletion or overwriting process in their computer systems that would destroy critical evidence.

In response to written discovery, defendants explain that their employees merely printed the vacancy reports from their computers as a means to provide the requested ESI to HUD and in this litigation. Defendants' expert, Greene, analyzes copies of documents provided by the defendants without identifying any type of methodology used to preserve or analyze the data base systems. The defendants have not provided any explanation as to whether snapshots of live data bases have been instituted, whether back-up files exist, or what computer files, if any, have been searched for the relevant ESI. Furthermore, based on the explanations provided by the defendants, as each day passes, valuable evidence may be lost, destroyed, or over written as it appears the software system remains in use during

the pendency of this litigation.[8]

Identifying relevant records and working out technical methods for their production is a **cooperative undertaking** not part of the adversarial process. *In re Seroquel Products Liability Litigation*, 244 F.R.D. 650, 660 (M.D. Fla. 2007) (emphasis added). Given today's technology and the increasing change from paper files to electronic files, litigants must understand their computer systems, data applications, automatic destruction and deletion protocols, back-up systems, and what type and where electronic information is stored, so that discovery can proceed efficiently. Information as to how ESI is retrieved, searched, and stored is no longer considered work-product, and must be conveyed to the opposing party for discovery to proceed in a cost-effective and time efficient manner. Clearly, the record in this case reflects tipping the scale in the adversarial direction as opposed to cooperation.

**C.    The United States' need for the requested ESI outweighs any burden to the defendants.**

The court in *Zubulake v. UBS*, 217 F.R.D. 309, 322 (S.D.N.Y. 2003), considered factors such as narrowness of discovery demand; alternate availability of ESI; cost of production; and the need for ESI as a test for the production of ESI.

---

[8]A "dynamic system" is a system that remains in use during the pendency of the litigation and which ESI changes on a routine and regular basis, including the automatic deletion or overwriting of such ESI.

The thrust of defendants' argument, however, has continued to be the general assertion that a mirror image of Warren Properties' hard drives would be overly intrusive, unduly burdensome, and would potentially retrieve privileged, confidential, and/or irrelevant information.  Courts allowing mirror imaging of hard drives have generally found that any time constraints and privacy concerns can be neutralized by the parties as long as they take adequate steps to assure that the process is as non-invasive as possible.

For instance, in *Capitol Records, Inc. v. Alaujon*, No. 03CV11661-NG, 07CV11446-NG, 2009 WL 1292977, at *2 (D. Mass. May 6, 2009), the court, after ordering the mirror image of the defendant's hard drive, issued an extensive protective order which regulated the exposure of personal information, which was not related to any relevant discovery.  The order in *Alaujon* protected various confidential and privileged information, including attorney-client communications, medical records, academic records, and unpublished research.  The court strengthened the order by listing several provisions including a confidentiality agreement between the parties, a provision that only the designated expert be allowed to inspect the computer and imaged hard drive, and a provision that the expert not examine irrelevant personal data.  *Id.*  The court also noted that the process for imaging the hard drive required no more than several hours.  *Id.*

Likewise, the defendants' concerns for privacy, confidentiality, and

privilege in the present case can be alleviated with an appropriate order from the court, confidentiality agreements, and an approved ESI protocol. The United States has agreed to bear the cost of the mirror image and subsequent forensic analysis; and furthermore, the United States has suggested after hours or weekend imaging so that business disruption, if any, will be minimal. Ex. 20, Dimitrelos Decl. at ¶ 10. The United States has narrowed its ESI request, and has been given no alternative by the defendants as to how this relevant ESI can be retrieved.

Simply put, defendants have continued to argue scope, relevance and privilege when these issues should not have prevented cooperation in preserving the evidence by way of mirror image. *See, e.g. Calyon v. Mizuho Securites USA Inc.*, No. 07CIV02241RODF, 2007 WL 1468889, at *1 (S. D. N.Y. May 18, 2007) (Parties agreed to preserve hard drive of individual defendants' personal computers and computer storage devices by creating mirror images and sought court intervention as to the scope of the parties' protocol). Moreover, the expense to the Government, as well as to the defendants in the form of legal fees, certainly could have been avoided if defendants had cooperated in identifying relevant computer systems and hard drives pertaining to ESI; adequately informed and assured the United States that data had been preserved and that automatic deletion protocols had been halted; or had worked with the United States in proposing an acceptable alternative to imaging their hard drives as a means to produce authentic and

accurate electronic files on the apartment availability issue.

## CONCLUSION

In continued pursuit of relevant ESI information, the United States has requested compliance with Rule 26(a) obligations, has requested preservation of critical ESI, has filed formal discovery requests, has engaged in numerous telephonic and written correspondence with defendants' counsel, and has offered to bear the cost of production, limited the scope of the request, and proposed a protective protocol.  Yet, the ESI has not been produced.

The need for the information is great.  The burden on defendants to provide it is not.  The motion to compel should be granted.

WHEREFORE, the United States moves this Honorable Court to enter an Order compelling the defendants, Warren Properties and Warren Village Partnership, to produce the ESI required by Rule 26(a) and pursuant to the United States' formal discovery requests in an acceptable electronic format (i.e. native format); to allow the United States to obtain the mirror images of defendants' hard drives that contain the Realwise© software programs, or any other software programs, used by Warren Village to document apartment rental status; to allow the United States, through its computer expert, to perform a forensic analysis of the imaged hard drives subject to an agreed or court ordered protective protocol;  and to grant the United States costs and attorneys fees incurred in preparing this motion to compel.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Dated: July 9, 2010.          By *Deidre Colson/GAS*

_____
Deidre Colson (COLSD4360)


*Gary Alan Moore/GAS*

_____
Gary Alan Moore (MOORG6851)
Assistant United States Attorneys
63 South Royal Street, Suite 600
Mobile, Alabama 36602
Telephone:  251.441.5845
Facsimile:  251.441.5051
E-mail:     gary.moore2@usdoj.gov
            deidre.colson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2010, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will effect service of this motion to the following counsel of record:

Thomas O. Gaillard
James B. Rossler
Daniel A. Hannan
Henry Brewster
Josh Wilson
Alicia Jacob


*Eugene A. Seidel*

_____
Eugene A. Seidel
Assistant United States Attorney

S:\civil\Warren Properties\motion to compel\motion to compel 07-09-10.wpd

31